Filed 12/30/14  P. v. Williams CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>DEXTER PAUL WILLIAMS,<br><br>　　Defendant and Appellant. | B252407<br><br>(Los Angeles County Super. Ct.<br>　No. GA077852) |

APPEAL from a judgment of the Superior Court of Los Angeles, Janice C. Croft, Judge.  Affirmed.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Chung Mar, Deputy Attorney General, and Jessica C. Owen, Deputy Attorney General, for Plaintiff and Respondent.

_____

The jury convicted defendant and appellant Dexter Paul Williams of first degree murder (Pen. Code, § 187),[1] and found true the allegation of personal use of a firearm (§ 12022.53, subd. (d)).[2]  In a bifurcated proceeding, the court found true the allegations that defendant sustained two prior convictions under section 667, subdivision (a), and the three strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and served four prior prison terms under section 667.5, subdivision (b).

The trial court sentenced defendant to 110 years-to-life in state prison, comprised of 25 years-to-life on the murder conviction, tripled under the three strikes law, 25 years-to-life for the gun enhancement, and 10 years for the two prior convictions pursuant to section 667, subdivision (a).

Defendant contends that the trial court abused its discretion in admitting prejudicial gang evidence and a recording of a "jail call" between defendant and his mother.  Alternately, he argues that cumulative error deprived him of a fair trial.

We affirm the judgment.

## FACTS[3]

On August 28, 2004, Gabriela Ruiz and her brother Angel had a party at their parent's house in Monrovia.  Angel was a member of Monrovia Nuevo Varrio (MNV), a predominantly Hispanic gang that also had some White and Black members.  Gabriela did not associate with a gang.  Because the siblings had different friends the partygoers split into two groups, with Gabriela's friends mostly hanging out on the patio, and

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] This was defendant's second jury trial.  The first was declared a mistrial after the jury declared it was deadlocked.

[3] The facts are as presented by the prosecution.  The defense did not present any evidence.

Angel's friends congregating in the alley. The party was attended mostly by Hispanics, but a few Blacks were also present.

Many MNV gang members attended, including Derrick Charles (aka Travieso), Jorge Mendez (aka Snuffy), and Teddy Tamayo (aka Valente). The murder victim, Ernesto Granado (aka Baby Face), also a gang member, arrived with Tamayo. A few hours after Mendez got to the party, defendant arrived in a light-colored car, which he parked off to the side in the alley. Defendant was an older MNV member, and had the moniker "Sombra," which is Spanish for "Shadow." Defendant said hello to some of the gang members in the alley and headed toward the house, where some of Gabriela's friends were congregated.

Defendant walked up to a group that included Joseph Escobar, Amanda Arredondo, Shannon Nevarez-Garcia, and Gabriela's older brother, Jose. No one in the group knew defendant. Defendant asked Escobar for a cigarette and was given a Marlboro Red. Escobar then left, because he did not know defendant and he felt awkward. Arredondo and Nevarez-Garcia also felt uncomfortable. Eventually, all of Gabriela's friends left defendant to go inside. Defendant appeared to be offended by this, and Arredondo tried to "diffuse the situation," but defendant appeared to be getting angry. Gabriela went over to defendant and asked if he was looking for his friends. She indicated that Angel's group was in the alley.

Later in the evening, Mendez saw defendant and Granado standing in the alley in a confrontational way. Tamayo initially told police that he heard someone yell a racial epithet, although he denied making that statement at trial. Granado threw his arms up at defendant in a challenging manner, and then turned away from defendant. Defendant then pulled out a gun and fatally shot Granado once in the back of the head. After the shooting, everyone scattered, but Gabriela, who was in the house, ran out to the alley. She thought the gun shot was a loud firecracker, and assumed her brother was setting off fireworks. Gabriela then noticed Granado's body lying on the ground near defendant's car. She thought that Granado was drunk or had gotten in a fight. Defendant got into the car and tried to leave, but Granado's body was behind his left tire and blocked him from

3

driving away. Defendant tried to back over the body. Gabriela tried unsuccessfully to revive Granado, so she banged on the car and yelled for defendant to stop driving because there was a body behind his car. She screamed for someone to call the police. Defendant told her not to call. She was able to move Granado with her brother's help. Once Granado's body was clear of defendant's car, Gabriela saw blood on his head. Defendant drove off.

Detective Robert Manuel of the Monrovia Police Department's Crimes Against Persons Unit was initially assigned to investigate. Despite his efforts, the crime remained unsolved in 2008. The investigation was reopened by a multi-agency task force assigned to unsolved gang cases. Monrovia Detective Stewart Levin and Los Angeles County Sheriff's Detective Timothy Brennan investigated Granado's murder. Witnesses to the crime were reinterviewed as part of the investigation. In the course of one such interview, Escobar stated for the first time that he had given defendant a Marlboro cigarette. Detective Levin had Marlboro cigarette butts found at the crime scene tested for DNA. Defendant's DNA was found on one cigarette from the scene.

Detective Brennan heard that Mendez had information about the murder, and picked him up on a possible probation violation. Mendez denied being at the party initially, but then said that he saw defendant shoot Granado. He recanted his statement at defendant's first trial, but decided to testify in the second trial because he "would never want [his] daughter's life to be taken away from [him] as a father in the way that [Granado's] life was taken away from him . . . ." At the retrial, Detective Levin testified that Mendez told him he was afraid for his family a few days prior to the first trial. Mendez had relocated, but a brick had been thrown through his window after he moved. Mendez testified under a grant of immunity.

Detective Brennan interviewed Charles, who said that "Shadow smoked Baby."

Detective Brennan also interviewed defendant. Defendant denied being at the party several times and said that he attended a family funeral that weekend. During the trial, Detective Levin began to listen to calls that defendant had made from jail. In one call defendant made during the first trial, he told his mother, "You guys are going to have

4

to communicate more about this and get it together so when the questions are asked like that or when you're talking to [the investigator], everybody can have the same thing to say pretty much you know what I mean?"

## DISCUSSION

### *Gang Evidence*

Prior to trial, defense counsel moved to exclude all gang evidence and gang membership evidence in the absence of a gang allegation under section 186.22, citing to *People v. Cardenas* (1982) 31 Cal.3d 897 (*Cardenas*). He argued that the murder motive was just as likely personal as gang motivated, and that gang evidence would be marginally relevant, highly prejudicial, and entail significant consumption of time. Alternately, he sought to exclude the testimony of Detective Brennan, in his capacity as an expert witness on gangs. Defense counsel stated that the evidence could be brought in through other witnesses, including Charles, who had been "very forthright" about what can happen to a gang member who comes to trial to testify. If the trial court allowed Detective Brennan to testify as an expert, defense counsel requested that his curriculum vitae be pared down to exclude testimony that he traveled to be involved in other investigations, which was "somewhat over the top and unnecessary."

The prosecution argued that the gang evidence was extremely probative to the case. Defendant was significantly older than most of the partygoers, and the fact that he was a gang member and that there were other members of his gang present would explain his presence there. The gang testimony would also explain why people scattered after the shooting and did not come forward to testify, despite the fact that there was a crowd and likely many witnesses. Mendez said that a brick had been thrown through his window prior to him changing his testimony in the last trial. Detective Brennan could explain the fear and intimidation caused when one gang member shoots another. Detective Brennan's curriculum vitae should not be pared down because it was important to show

5

why the task force chose to review the unsolved case again in 2009. Detective Brennan has specialized training in the area of gangs and it would be important for the jury to know that. He had numerous local contacts that he could utilize to track down potential witnesses.

The trial court ruled that the gang evidence was "very probative," and allowed it to be admitted for the purposes of motive, intent, and witness credibility. The trial court forbade any testimony on predicate acts or crimes of the gang. It limited the purpose of such evidence with a jury instruction that had been given at the previous trial. The instruction stated:

"You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant had a motive to commit the crime charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

Detective Brennan testified as the prosecution's gang expert at the trial. He explained that he was part of a multi-agency task force formed in 2008 to respond to the approximately 90 gang-related shootings that occurred in Monrovia between 2006 and 2008. He explained that gang loyalty is very important, and that if a gang member snitches to police it is considered disloyal and disrespectful. Gang members may retaliate against the "snitch" or his family members by violently assaulting or killing them. Gang culture is hierarchical, and if an older member is disrespected, he must respond forcefully to maintain respect, especially if other gang members are present. This is critical to showing that the gang member will back up other members when they commit crimes, which they are encouraged to do to gain respect.

In closing argument, the prosecutor explained that it was not easy for witnesses to come forward "in a gang case" because with the label of "snitch" hanging over them, they could get into big trouble if they were sentenced to prison. The prosecutor urged the

6

jury to keep this in mind when evaluating Mendez's credibility. The prosecutor argued that loyalty was critical to the gang's survival, and that members had to show how tough they were. Defendant acted the way that he did to maintain respect in front of other gang members.

On appeal, defendant contends that the trial court abused its discretion in admitting the gang evidence because it was highly inflammatory and prejudicial, and only minimally probative. We disagree.[4]

In general, evidence is admissible if its probative value is not substantially outweighed by the probability that it will unduly consume time, "create substantial danger of undue prejudice," confuse the issues, or mislead the jury. (Evid. Code, § 352.) The courts recognize that gang evidence may have a "highly inflammatory" impact. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 (*Samaniego*).) Where no gang enhancement is involved "evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal." (*People v. Hernandez* (2004) 33 Cal.4th 1045, 1049 (*Hernandez*).) Nevertheless, gang evidence may be admitted in the absence of a gang allegation "if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative." (*Samaniego*, *supra*, at p. 1167.) "[E]vidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt

_____

[4] In support of his contention, defendant cites to defense counsel's objections and the trial court's rulings in the first trial. We note that the trial court inquired whether the parties made any stipulations that these objections and rulings stay in effect at the second trial, and defense counsel responded that there was no stipulation and the issues would need to be relitigated. We will not consider the objections and rulings made at the prior trial, as "[either] party [may] elect different trial tactics at a second trial, [and] the trial court being more fully informed must be given the opportunity to reconsider the prior ruling." (*People v. Clark* (1990) 50 Cal.3d 583, 624, fn. omitted.)

7

of the charged crime." (*Hernandez, supra,* at p. 1049.) "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to [his] credibility and is well within the discretion of the trial court. [Citations.]" (*People v. Burgener* (2003) 29 Cal.4th 833, 869.) "[T]he decision on whether evidence, including gang evidence, is relevant, not unduly prejudicial and thus admissible, rests within the discretion of the trial court." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-25 (*Albarran*).)

We find no abuse of discretion in the trial court's decision to admit the gang evidence. Mendez, the only percipient witness to the murder to come forward, had recanted at the first trial soon after a brick was thrown through his window. Evidence that other gang members retaliate against a "snitch" by seriously assaulting or killing him or his family, tended to show Mendez's motivation for recanting. This strong incentive not to testify to witnessing the murder mitigated in favor of finding Mendez's testimony at the second trial credible. It also explained why, in a situation where many people were potential witnesses, no others came forward.

Additionally, the gang evidence provided a motive for the shooting. Defendant's argument that there were personal reasons that could have motivated the shooting is unpersuasive. Racial epithets alone are not generally enough to motivate a murder. The trial court could reasonably conclude that it is more believable that a gang member would shoot another person to maintain his reputation within the gang. The prosecution was entitled to present this evidence to help explain why the crime was committed. Under these circumstances, the gang evidence was relevant to motive and to the credibility of a key witness. It had substantial probative value, thus outweighing any prejudice.

The facts of this case are entirely different from *Cardenas, supra,* 31 Cal.3d 897, and *People v. Avitia* (2005) 127 Cal.App.4th 185 (*Avitia*), cited by defendant. In those cases, the gang membership had no tendency to prove disputed facts.

In *Avitia,* the gang evidence was graffiti found in the defendant's bedroom. No gang enhancement was alleged and there was no evidence the offenses charged

8

(discharging a firearm and possession of assault weapon) were related to gang activity. The graffiti evidence was proffered to show that the gun used in the crime belonged to the defendant. But the graffiti was cumulative evidence since the defendant offered to stipulate to the ownership of the weapon. (*Avitia*, *supra*, 127 Cal.App.4th at p. 193.)

In *Cardenas*, the admission of gang evidence was offered to show that the defense witnesses were biased. But evidence had already been admitted that the defendant and the witnesses were neighborhood friends, and thus the fact that they were all members of the same gang was cumulative and more prejudicial than probative. (*Cardenas*, *supra*, 31 Cal.3d at pp. 904-905.)

Here, the evidence was relevant to motive, intent, and the credibility of the witnesses. Defendant's assertion that there was sufficient evidence that the motivation was personal is of no moment. The prosecution is not restricted to a single motive to support its theory of the case, and should not be prevented from presenting a theory strongly supported by the facts. The trial court weighed the probative value of the gang evidence against the potential for prejudice, and we cannot say that it abused its discretion in deciding to admit the evidence.

Defendant's claim that admission of gang evidence violated his federal due process rights, citing *Albarran*, *supra*, 149 Cal.App.4th at pp. 228-229, is without merit. *Albarran* involved an extreme situation in which the jury was presented with "[e]vidence of threats to kill police officers, descriptions of the criminal activities of other gang members, and reference to the Mexican Mafia [that] had little or no bearing on any other material issue relating to [the defendant's] guilt on the charged crimes and approached being classified as overkill." (*Albarran*, *supra*, at p. 228, fn. omitted.) In finding reversible error, the *Albarran* court held the trial was rendered fundamentally unfair and it was not convinced beyond a reasonable doubt that the admission of gang evidence did not contribute the jury's verdict when taking into consideration the "nature and amount of this gang evidence at issue, the number of witnesses who testified to [the defendant's] gang affiliations and the role the gang evidence played in the prosecutor's argument . . . ." (*Id*. at p. 232.)

9

Nothing remotely similar to *Albarran* occurred in this case. Evidence of extraneous gang activities was not introduced. The trial court precluded evidence of predicate gang offenses which would have been required had a gang enhancement been alleged under section 186.22. No reference was made to a notorious prison gang. The gang evidence was tailored to the relevant issues of intent, motive, and credibility. No due process violation occurred.

With respect to defendant's claim under state law, any error was harmless in light of the strength of the prosecution evidence. Defendant's presence at the party was established by multiple witnesses, and by DNA evidence obtained from a cigarette butt, which one witness testified he gave to defendant. Mendez testified that he saw defendant shoot the victim. Charles told detectives that that "Shadow smoked Baby." Gabriela witnessed defendant attempting to drive over the victim's body to leave the party. Defendant told her not to call the police after the murder, showing no concern for the person behind his car, and trying to discourage intervention by law enforcement. Defendant's flight from the scene is indicative of guilt. Given this evidence, it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of Detective Brennan's expert witness testimony.

*Jail Call*

During trial, the prosecution sought to admit a recorded telephone call between defendant and his mother, which defendant made while in custody in February 2012. In the call, defendant told his mother that he needed to know the date that a family member's wife had died. Defendant was adamant that he needed to know the exact date, and stated, "See, I don't want you listening to half of what I'm saying. . . I want the number, the date. I want to write it down. [¶] . . . Because look, look, look, listen to me. 'Cause I'm gonna give you a few more, look. 'Cause all you guys are gonna have to come together a little closer. . . you, Roger. . . see Vera knows a lot of this how a lot of this was stated from the beginning because the conversations I guess they had with the

10

last lawyer and how they wrote that down. [¶] [¶] . . . I went up there when she was ill and stayed until after we buried her and came back because I hadn't seen my brother in years you know so I stayed with him and spent more time. I didn't come back until early September. But, know, 'cause we trying to get the conversations or in the timing exact. Everybody saying the same thing. You understand me? [¶] And that needs to be record, so we need that to be pretty much the simulations that to everybody who saying what. Because there's gonna be a time when the investigator needs to speak to everybody. And you gonna have to accord, be in accordance. Everybody on the same note. [¶] [¶] [¶] . . . You guys are going to have to communicate more about this and get it together so when the questions are asked like that or when you're talking to him . . . everybody can have the same thing to say pretty much you know what I mean?"

**Timeliness of discovery**

The purpose of the criminal discovery statutes is "[t]o promote the ascertainment of truth." (§ 1054.) The statute requires the prosecution to provide all relevant evidence to the defense. (§ 1054.1.) The discovery statutes contemplate that discovery "shall be made at least 30 days prior to the trial," however "[i]f the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred." (§ 1054.7.) Various remedies for late disclosure of evidence are left to the discretion of the trial court (§ 1054.5, subd. (b)), however, "[t]he court may prohibit the testimony of a witness pursuant to subdivision (b) only if all other sanctions have been exhausted." (*Id.* at subd. (c).)

There was no violation of the timeliness requirements of the discovery statutes, because the records relating to the jail calls were obtained within 30 days of trial and were turned over in a timely fashion. Detective Levin stated that he requested the records from the sheriff's department in early March 2013. He had just been made aware that the sheriff's department had the capability to search inmate calls by a personal identification

11

number (PIN) to obtain target phone numbers that would allow them to retrieve specific calls. He believed the sheriff's department turned the calls over to him during the week of March 8, 2013. Detective Levin went through the calls and prepared a report immediately. He turned everything over to the district attorney right after the report was completed. The trial court confirmed that the defense received the calls on March 13, 2013.

Both sides announced that they were ready for trial on March 13, 2013, the day discovery of the contents of the calls was provided. A continuance was not requested by the defense. Two weeks later, on March 27, 2013, defense counsel objected on grounds of late discovery and relevance. Defense counsel stated that at the time he received the compact disc with the recorded calls, he was under the impression that there were about 10 hours of audio recordings. In fact, there were approximately 316 calls relating to defendant and 27 calls relating to Charles, which he estimated represented about 150 hours of audio. Defense counsel admitted that he announced that he was ready for trial after he received the discovery, but explained that he was under the impression that the amount of audio was manageable. Counsel did not know when Detective Levin became aware of the calls or obtained the recordings, but he had just been given calls that were as recent as March 21, 2013, so he believed that access must not be difficult. The calls were hearsay that defendant could impeach with hearsay. The defense would need the opportunity to review all of them. Defense counsel also argued the call would be confusing to the jury under Evidence Code section 352. The jurors would not understand why defendant had not presented an alibi after introduction of the jail call. It was not clear from the call whether defendant was suborning perjury, or just making sure everyone had their stories straight, which could be misleading.

The prosecutor explained that in the previous trial, the defense presented him with two relatives who would testify as alibi witnesses. As trial progressed, it became clear that the witnesses would not be called. The prosecution told the trial court that it had intended to impeach the witnesses to show that defendant was fabricating evidence. The trial court asked if the prosecution had impeachment evidence. At that point the

12

prosecution did not have impeaching testimony, and when the prosecution called the witnesses to the testify, they denied that defendant attempted to present false alibis. The prosecution then contacted Detective Levin to see if he could begin listening to jail calls, but at that time the sheriff's department could not retrieve calls without target phone numbers. Within the last few months, however, technology had improved, and calls could be retrieved using inmates' PINs. Detective Levin retrieved all calls with defendant's PIN and obtained target phone numbers, which he could associate with specific calls. Detective Levin culled through the calls and made a report. A copy of the calls and the report were immediately given to the defense. The calls were straightforward in their content, and probative. It was clear that defendant was attempting to construct an alibi, which showed consciousness of guilt.

The trial court ruled that the call could be admitted, but only if Detective Brennan testified that defendant originally stated that he was out of town for a funeral the night of the party. Without that explanatory testimony, the call would not be relevant. The court found there was no late discovery. Technology had improved, the detective took advantage of the technological advance, the calls were reviewed immediately, and everything was turned over to the defense promptly. Detective Brennan testified that defendant told him he was at a relative's funeral at the time of the murder, and the recorded call was presented to the jury.

The trial court's ruling on the timeliness of discovery is supported by substantial evidence. Upon receiving new information regarding the calls, Detective Levin compiled the information and drafted his report, which was immediately provided to the defense. Discovery was provided as contemplated by section 1054.7, subdivision (b), when new evidence is developed within 30 days of trial. Moreover, the defense did not seek a continuance, and the drastic remedy of exclusion of a witness's testimony would not have been warranted until all other remedies were exhausted. (§ 1054.5, subd. (c).)

**Exclusion under Evidence Code section 352**

The recorded call had probative value, because it tended to show a consciousness of guilt by fabrication of evidence. "Deception, falsehood, and fabrications as to the facts of the case are treated as tending to show consciousness of guilt, and are admissible on the same theory as flight and concealment of the person when charged with crime." (*People v. Cole* (1903) 141 Cal. 88, 89-90.) Defendant argues that falsity must be demonstrated by the defendant's own testimony, and that because defendant did not testify here, it was an abuse of discretion to admit the jail call. Defendant's reliance on *People v. Thomas* (1979) 96 Cal.App.3d 507, and *People v. La Salle* (1980) 103 Cal.App.3d 139 is misplaced, as both were expressly overruled in *People v. Kimble* (1988) 44 Cal.3d 480, 496 (*Kimble*). The *Kimble* court reasoned that "although the fact that a defendant has—on the witness stand—contradicted a prior statement that he made relating to the crime provides *one* basis for the jury to determine that the earlier statement was false, it simply does not follow that the jury would necessarily be engaging in 'rank speculation' if it relied on other evidence to determine that the prior statement was false. In many cases, such other evidence—which may consist of physical evidence like fingerprints, or the testimony of trustworthy witnesses—will be equally, if not more, reliable than defendant's own in-court testimony." (*Id.* at p. 498.) Moreover, "'[f]alse statements deliberately made by defendants to arresting officers concerning matters within [defendants'] own knowledge, and relating to the issue of guilt or innocence, "cogently evidence consciousness of guilt and suggest that there is no honest explanation for incriminating circumstances."' (Witkin, Cal. Evidence (2d ed. 1966) § 512, at p. 482, and cases cited.)" (*Id.* at p. 496, fn. omitted.)

Defendant told Detective Levin that he was out of town at a relative's funeral on the night of the shooting. Eyewitnesses saw him at the party, and at least one witness saw him shoot Granado. Evidence was presented that defendant smoked a cigarette at the party, and one of the cigarette butts collected matched defendant's DNA. The jail call indicating that defendant was attempting to arrange for his family to provide a single

account of his whereabouts on the night of the party tends to evidence a consciousness of guilt. The trial court did not abuse its discretion in determining the evidence was relevant under Evidence Code 352.

*Cumulative Error*

Finally, defendant contends that cumulative errors at trial deprived him of due process. As we have concluded that the trial court did not err, the contention necessarily fails. (See *People v. Hines* (1997) 15 Cal.4th 997, 1062.)

**DISPOSITION**

The judgment is affirmed.

KRIEGLER, J.

We concur:

MOSK, Acting P. J.

GOODMAN, J. *

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.