[No. 50176-9.    En Banc.    November 1, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. FRED DALE LEFEVER II, *Petitioner.*

*Richard Hansen* and *Allen & Hansen, P.S.,* for petitioner.

*Norm Maleng, Prosecuting Attorney,* and *Deborah J. Phillips, Deputy,* for respondent.

DOLLIVER, J.—Defendant Fred Dale LeFever asks this court to reverse a decision of the Court of Appeals which affirmed his conviction of one count of first degree robbery and two counts of second degree robbery, a finding of his being a habitual criminal, and ruled his probation was properly revoked.

The charges against defendant arose out of three robberies at two Safeway stores in Seattle which occurred on September 5 and 7, and October 17, 1981. In each robbery the robber disguised himself by putting Band–Aids on his face, stuffing cotton up his nostrils, and wearing a fake beard and sideburns.

Defendant was arrested on October 20, 1981. His parole officer, James Kairoff, was present. Defendant asked to speak with him. Although Kairoff told defendant he had no obligation to say anything, defendant chose to tell Kairoff he had a $125–a–day heroin habit and that he had made arrangements to enroll in a drug rehabilitation program the next day. Defendant told Kairoff his wife was providing him with enough money to buy heroin during the 5–day waiting period prior to entry into the drug program. At the

time, defendant was earning $1,400 per month and his wife's earnings totaled $320 per month.

At trial, the court ruled defendant's admissions of heroin addiction to Kairoff were not privileged, but were admissible to show motive to commit the robberies.

Before trial, the State moved to use prior convictions against defendant to prove identity. ER 404(b). This the trial court denied. Defendant's counsel then moved to exclude from evidence defendant's 1974 conviction of three counts of robbery for impeachment purposes. Counsel suggested defendant could instead be impeached with his 1971 forgery conviction or 1980 theft conviction, or that the 1974 convictions could be used without specifying their nature. This motion was also denied and the court ruled all prior convictions could be used for purposes of impeachment.

At trial, defendant attempted to introduce the testimony of Robert Boruchowitz, Director of the Public Defender's Office for King County. During an offer of proof, Boruchowitz testified he routinely attends lineups to advise suspects and interview witnesses and make written records of the relative certainty of witnesses' identifications. His notes for October 21, 1981, indicated some of the State's witnesses' identifications of defendant in the lineup had been tentative. When questioned, however, Boruchowitz was unable to state the exact source of his information. This testimony was ruled inadmissible.

Defendant did not testify at trial. He was convicted of all three robberies. In his motion for a new trial, defendant submitted an affidavit which states he did not testify because of the danger of unfair prejudice he feared would result from cross examination regarding prior convictions. Additionally, he was concerned "the evidence of his heroin use created an issue which was not relevant to the charges against him and which unfairly influenced the jury to convict him." If allowed to testify, defendant would have alleged he began using heroin approximately 3 weeks before his arrest, his drug use had initially cost only $20 per day, he occasionally obtained heroin by selling drugs to others,

and he had used a $600 settlement for collision damage to his car to buy heroin. This testimony would support defendant's claim that the funds used to purchase heroin were from sources other than the proceeds of the robberies. The motion for new trial was denied.

Subsequently, defendant was charged with being a habitual criminal. Four prior convictions were alleged: (1) 1971 conviction for first degree forgery; (2) 1972 federal conviction for possession with intent to distribute heroin; (3) 1974 conviction for three counts of robbery; and (4) 1980 conviction for possession of stolen property in the second degree. Counsel for the defendant challenged the 1980 conviction which was then on appeal and argued the other three convictions could not be used because they were based on constitutionally invalid guilty pleas. The court initially granted the motion to dismiss the habitual criminal proceeding, finding the 1980 conviction could not be used because it was on appeal and the 1974 convictions to be based on constitutionally infirm guilty pleas.

A subsequent motion by the State for reconsideration was granted, the court stating it had "granted the motion to dismiss on the mistaken interpretation of fact that there were only four convictions before the Court whereas there apparently were five, the instant one and four previous." Moreover, in the previous hearing, the court had not ruled on the 1971 and 1972 convictions. The court went on to find the 1971 and 1972 convictions constitutionally valid and defendant guilty of being a habitual criminal.

Thereafter, defendant was given notice of a probation revocation hearing based on his robbery convictions in 1982 and his habitual criminal status. In June 1982 an order was entered revoking defendant's probation on his 1980 conviction for possession of stolen property. During oral argument, the parties agreed this decision was based solely upon defendant's convictions of robbery and of being a habitual criminal and not his addiction to heroin.

The Court of Appeals affirmed all lower court proceedings, *State v. LeFever,* 35 Wn. App. 729, 669 P.2d 1251

(1983). We granted defendant's petition for review.

I

Defendant argues it was error to admit evidence of his heroin addiction as proof of motive for the robberies. He believes this evidence was impermissible under ER 404(a) as it was used to show his character "for the purpose of proving that he acted in conformity therewith . . ." Additionally, defendant contends any probative value of this evidence was substantially outweighed by the danger of undue prejudice. ER 403. The State argues the heroin addiction evidence was significant to show defendant's financial need to support his habit which was relevant to explain his motive and therefore admissible under ER 404(b). Moreover, the State asserts the trial court carefully balanced the probative as opposed to the prejudicial effect of the evidence and thereafter properly admitted the evidence.

■ The admissibility of evidence of an illegal drug addiction to prove motive is governed by ER 404(b).

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . .

This rule must not be read in a vacuum but in conjunction with ER 401 through 403. *State v. Saltarelli*, 98 Wn.2d 358, 361–62, 655 P.2d 697 (1982). Thus, motive evidence is admissible only if it is relevant, making the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. ER 401, 402. If relevant, then the probative value of the evidence must be balanced against its prejudicial effect. ER 403. Regardless of whether the evidence is relevant or probative, in no case may evidence be admitted to prove the character of the accused in order to show that he acted in conformity therewith. ER 404(b); *State v. Saltarelli, supra* at 362.

The Court of Appeals found defendant's addiction was highly probative of motive—there was conclusive evidence of a costly habit, he did not have sufficient legitimate income to finance his addiction, and the physical and mental suffering associated with heroin addiction provided a compelling impetus to resort to illegal means. 35 Wn. App. at 733. Although noting evidence of drug use may have some prejudicial effect, the Court of Appeals ruled the trial court cautiously treated any prejudicial effects and did not abuse its discretion in admitting evidence.

Other courts faced with this issue have split over the admissibility of evidence of a defendant's drug addiction. Annot., *Admissibility of Evidence of Accused's Drug Addiction or Use To Show Motive for Theft of Property Other Than Drugs,* 2 A.L.R.4th 1298 (1980). The two cases most factually similar to this appeal are *People v. Cardenas,* 31 Cal. 3d 897, 647 P.2d 569, 184 Cal. Rptr. 165 (1982) and *Gould v. State,* 579 P.2d 535 (Alaska 1978). Those cases and this appeal both involve convictions based upon inconsistent eyewitness testimony.

In *Cardenas,* defendant was convicted of attempted murder and robbery and assault with a deadly weapon. The prosecution's case, however, was not overwhelming. 31 Cal. 3d at 907. First, the witnesses' estimates of the assailant's height (5 feet 7 inches to 5 feet 9 inches) did not approximate the height listed for defendant when booked (5 feet 2 inches). Second, two witnesses indicated he was clean shaven, while a third thought he wore a moustache and beard. Third, not a single witness was able to identify the defendant consistently in mug shots and a pretrial lineup. 31 Cal. 3d at 908. The court was bothered by the closeness of the case and the fact defendant's heroin addiction was mentioned eight separate times. 31 Cal. 3d at 909. In reversing the conviction the court recognized:

> The impact of narcotics addiction evidence "upon a jury of laymen [is] catastrophic. . . . It cannot be doubted that the public generally is influenced with the seriousness of the narcotics problem . . . and has been

taught to loathe those who have anything to do with illegal narcotics . . .

31 Cal. 3d at 907 (quoting *People v. Davis,* 233 Cal. App. 2d 156, 161, 43 Cal. Rptr. 357 (1965)). *See, e.g., State v. Renneberg,* 83 Wn.2d 735, 737, 522 P.2d 835 (1974) ("evidence of drug addiction is necessarily prejudicial in the minds of the average juror").

In *Gould,* the four eyewitnesses described the defendant as having a moustache. Four defense witnesses testified, however, that the defendant had a full beard on the day of the robbery. The Supreme Court of Alaska held it was error to admit evidence of defendant's heroin habit due to the

absence of any "affirmative link" between the robbery and Gould's alleged heroin addiction. The only possible relevance of this evidence goes to the hotly contested issue of identification. The state's argument for relevance is based on reasoning that because Gould was unemployed and had a $300 a day heroin habit, he had to commit the robbery to support his habit. . . . [W]e find the proffered inference too attenuated and possessing "too many gaps" to show motive and thus the identity of the robber.

579 P.2d at 539. *See also Christian v. Tuscaloosa,* 53 Ala. App. 81, 297 So. 2d 405 (1974); *State v. Sutfield,* 354 So. 2d 1334 (La. 1978); *Jones v. State,* 38 Md. App. 432, 381 A.2d 317 (1978); *Powell v. State,* 478 S.W.2d 95 (Tex. Crim. App. 1972). *Contra, United States v. Saniti,* 604 F.2d 603 (9th Cir.), *cert. denied,* 444 U.S. 969 (1979); *United States v. Parker,* 549 F.2d 1217 (9th Cir.), *cert. denied,* 430 U.S. 971 (1977); *Archie v. State,* 137 Ga. App. 386, 224 S.E.2d 64 (1976); *People v. McConnell,* 124 Mich. App. 672, 335 N.W.2d 226 (1983).

██ We concur in the views expressed by the California and Alaska courts in their refusal to admit evidence of heroin addiction to show a link between the robberies and the addictions where the issue was identification. In this case we, too, are troubled by the wide variances in eyewitness testimony. Defendant's witnesses testified LeFever had a prominent moustache when the robberies occurred. Because

of the robber's disguises, however, some eyewitnesses to the crime remembered the robber with a moustache, while others did not. Even if the heroin habit could be used to show motive, where identification is the key element to be proved, the fact that defendant was a heroin user had limited probative value to show that he committed the robberies. When, as here, identification is crucial and eyewitness testimony as to identity is confused at best, it is error for the prosecution to introduce evidence of defendant's addiction to heroin. The resultant prejudice to one accused of a crime completely overwhelms any possible relevance or probativeness.

The trial court erred in allowing the State to introduce evidence of LeFever's heroin addiction as proof of motive for the robberies. Within reasonable probabilities, we find had the error not occurred, the outcome of the trial would have been materially affected. *State v. Robtoy,* 98 Wn.2d 30, 44, 653 P.2d 284 (1982). We hold this error not to be harmless but to be prejudicial and grounds for reversal.

## II

Defendant contends the trial court also erred by admitting evidence of his 1974 robbery convictions for purposes of impeachment. ER 609(a)(1). The Court of Appeals, finding defendant failed to make a timely offer of proof, did not reach the merits of this assertion. *State v. LeFever,* 35 Wn. App. 729, 736, 669 P.2d 1251 (1983) (quoting *State v. Hebert,* 33 Wn. App. 512, 516, 656 P.2d 1106 (1982)). Recently, in *State v. Koloske,* 100 Wn.2d 889, 676 P.2d 456 (1984), we ruled

if [a] defendant elects not to testify following a ruling under ER 609, defendant must ensure that the record includes a declaration of his intention to testify and an adequate offer of proof, either oral or written, to preserve any error for appellate review.

100 Wn.2d at 897. *See State v. Pam,* 98 Wn.2d 748, 763, 659 P.2d 454 (1983) (Utter, J., concurring).

In *Koloske,* we noted the trial court in most cases will find it necessary to evaluate the significance of defendant's testimony to the case before a proper ruling can be made. Moreover, we looked with disfavor upon defendants with no intention of testifying, who may seek a ruling in order to provide an additional ground for appeal in case of conviction, thereby potentially abusing ER 609. 100 Wn.2d at 897. Here, the defendant waited until his motion for a new trial to file an affidavit delineating his reasons for not testifying. Such a delay is too late to preserve his assignment of error.

We hold an offer of proof must be made, if a defendant elects not to testify, at the time of an ER 609 ruling. Only then may a court properly evaluate the importance of defendant's testimony and properly exercise its discretion through the balancing procedure prescribed by ER 609. *State v. Alexis,* 95 Wn.2d 15, 19, 621 P.2d 1269 (1980). This rule also enables the trial court to comply with the mandatory rule we set out in *State v. Jones,* 101 Wn.2d 113, 677 P.2d 131 (1984), which requires it to "state, for the record, the factors which favor admission or exclusion of prior conviction evidence." 101 Wn.2d at 122.

Not only did defendant fail to make a timely offer of proof, but the trial court also failed to delineate on the record its reasons for admitting the prior robbery convictions. These reasons, and the fact we are reversing on other grounds and cannot predict what motions and rulings will be made on any retrial, foreclose us from determining whether the trial court erred in admitting LeFever's prior convictions for impeachment purposes.

## III

Defendant asserts the trial court erred in excluding the testimony of Boruchowitz regarding the tentative nature of lineup identifications made by certain State witnesses. The Court of Appeals affirmed the exclusion, finding an inadequate foundation for admissibility. 35 Wn. App. at 736.

The general rule is "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a

finding that he has personal knowledge of the matter." ER 602. The burden of laying a foundation that a witness had an adequate opportunity to observe the facts to which he testifies is upon the proponent. 5 K. Tegland, Wash. Prac., *Evidence* § 219 (2d ed. 1982).

Boruchowitz testified he obtained his information by observing the witnesses mark the identification form and by interviewing the witnesses and detectives present. He was completely unable to specify the exact source of his proposed testimony with respect to specific witnesses. The burden of introducing sufficient evidence to support a finding of personal knowledge was not met. We affirm the trial court's ruling that the testimony of Boruchowitz was inadmissible.

## IV

Next, defendant contends the trial court's reconsideration and reversal of its decision dismissing his habitual criminal proceeding violates the double jeopardy clause of U.S. Const. amend. 5 and Const. art. 1, § 9. The Court of Appeals found no error and upheld the trial court's finding that LeFever was a habitual criminal. 35 Wn. App. at 740.

The trial court initially orally ruled "[o]n the basis of the argument and the briefs and a study of the cases, the Court grants the motion to dismiss the habitual criminal proceeding." The State contested this ruling but the court responded, "my rulings stand." Four days later, upon the State's motion for reconsideration, the trial court ruled on two other convictions it had not considered earlier and found the defendant to be a habitual criminal.

When a trial court dismisses a criminal case for insufficient evidence, no matter how erroneous that ruling may be, retrial of the defendant is precluded by the double jeopardy clause. The State may not obtain a motion to reconsider. *State v. Dowling*, 98 Wn.2d 542, 545, 656 P.2d 497 (1983).

> A finding by the court as the trier of fact, without a jury, when read conclusively into the record in such a

manner as to indicate that it is neither tentative nor made with reservation or advisement nor subject to further consideration or proceedings in the same case, will support a judgment of acquittal or dismissal.

98 Wn.2d at 547 (quoting *State v. Bastinelli,* 81 Wn.2d 947, 956, 506 P.2d 854 (1973)). We hold this same rule also applies to habitual criminal proceedings.

The record before us indicates the trial court's initial dismissal of the habitual criminal charge was a judgment of dismissal. It was not tentative nor subject to further consideration. Hence, the double jeopardy clause barred the subsequent proceeding in which defendant was found to be a habitual criminal. We reverse the finding of the trial court that defendant is a habitual criminal.

V

Lastly, defendant argues the trial court erred in revoking his probation. As noted previously, defendant's probation was revoked based upon his conviction of the robberies and of being a habitual criminal.

[I]f probation for an earlier conviction is revoked solely on the basis of a new conviction that we subsequently reverse and remand for a new trial, the trial court must hold a new probation revocation hearing.

*State v. Dowell,* 26 Wn. App. 629, 632, 613 P.2d 197 (1980). This procedure must be followed here.

Defendant's convictions of one count of first degree robbery and two counts of second degree robbery are reversed; the finding he is a habitual criminal is reversed; the case is remanded to the trial court for a new probation revocation hearing.

WILLIAMS, C.J., and UTTER, BRACHTENBACH, DORE, and PEARSON, JJ., concur.

ROSELLINI, J., and CUNNINGHAM, J. Pro Tem., concur in the result.

DORAN, J.* (dissenting in part)—I cannot agree with the majority that (1) it was error in this case for the trial court to admit evidence of defendant's heroin addiction to prove a motive for the commission of the three robberies—the need for money; (2) the double jeopardy clauses of the state and federal constitutions are violated when the trial court, in a habitual criminal proceeding, reconsiders its oral decision dismissing the charge and, *solely* on the basis of documentary evidence already before the court, corrects an obvious error as to the number of convictions; (3) the revocation of the 1980 probation must be set aside because of the reversal of the robbery convictions.[1]

Defendant Fred Dale LeFever was convicted *by a verdict of a jury* of one count of first degree robbery and two counts of second degree robbery. Thereafter, in a nonjury trial defendant was adjudged to be a habitual criminal. Later, the probation granted defendant in 1980, after his plea of guilty to possession of stolen property in the second degree, was revoked on the basis of the robbery convictions.

As a result of the robbery convictions and the finding that defendant was a habitual criminal, he was sentenced to life imprisonment. On the possession of stolen property charge his suspended sentence was set aside and he was committed for the maximum term of 5 years.

Defendant appealed. The Court of Appeals affirmed. *State v. LeFever,* 35 Wn. App. 729, 669 P.2d 1251 (1983). The majority reverses. I would affirm the convictions and the sentences.[2]

---

*Judge Robert J. Doran is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amend. 38).

[1] I agree with the majority on issue (3). On Issue (2) regarding the use of the 1974 robbery convictions for impeachment in the event that defendant testified, I would simply hold, as did the Court of Appeals, that defendant failed to make a timely offer of proof. *State v. LeFever,* 35 Wn. App. 729, 736, 669 P.2d 1251 (1983).

[2] It appears defendant faced sentences of: (1) 20 years to life on the first degree robbery charge, (2) 10 years on each of the second degree robbery charges,

Defendant was charged with the robberies of the Crown Hill Safeway store on September 5, 1981, and of the Ballard Safeway store on September 7 and October 17, 1981.

## I
### Heroin Habit Admissible To Prove Motive for Robberies

The admissibility of evidence of prior criminal conduct, such as heroin addiction, is governed by ER 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . .

In the instant case evidence of defendant's expensive heroin addiction ($125 per day) was offered to prove the motive for the commission of the robberies. It was for the jury, under proper instructions, to weigh and consider the evidence offered by the State and defendant as to his need for money to buy drugs. The jury agreed with the State. There is no basis to set aside the verdict.

I agree with the majority that ER 404(b) must be read and considered in conjunction with other Rules of Evidence, particularly ER 402 and 403. *State v. Saltarelli*, 98 Wn.2d 358, 361, 655 P.2d 697 (1982). Thus, evidence of motive, such as heroin addiction, is only admissible if its probative value outweighs the danger of unfair prejudice. This is a determination which must be made by the trial court in the exercise of *its sound* discretion. *State v. Robtoy*, 98 Wn.2d 30, 653 P.2d 284 (1982); *State v. Rahier*, 37 Wn. App. 571, 574, 681 P.2d 1299 (1984). *See also State v. Laureano*, 101 Wn.2d 745, 764–65, 682 P.2d 889 (1984).

In *Robtoy* this court recognized the balancing of factors which must be done *by the trial court* in determining the admissibility of evidence under ER 404(b):

> The trial court must exercise its discretion in weighing

---

(3) life imprisonment on the habitual criminal charge. The convictions are not treated separately in the sentence and judgment.

the probative value of the evidence against its prejudicial effect, and *that decision will be disturbed only if the court abused its discretion.*

(Italics mine.) *Robtoy,* at 42. *See also State v. Rupe,* 101 Wn.2d 664, 686, 683 P.2d 571 (1984).

Stated another way, this court in *Laureano* said:

> While reasonable minds might differ as to whether the evidence . . . should have been admitted, on the record before us we find the court's decision was not manifestly unreasonable. *See State ex rel. Carroll v. Junker,* 79 Wn.2d 12, 482 P.2d 775 (1971). There was no abuse of discretion by the trial court. *See State v. Blight,* 89 Wn.2d 38, 40–41, 569 P.2d 1129 (1977).

*Laureano,* at 765.

The Court of Appeals applied the proper test and found that the trial court, on the record, carefully weighed the factors. Therefore, that court concluded the trial court did not abuse its discretion in admitting the evidence of the drug habit.

I agree with the Court of Appeals and the trial court that the defendant's heroin addiction was highly probative and outweighed the danger of unfair prejudice. The Court of Appeals stated:

> The trial court's determination that LeFever's addiction was highly probative of his motive to commit robbery is supported by the record. First, there was conclusive evidence that LeFever had a costly heroin habit. He admitted his addiction to his wife and his parole officer, both of whom so testified. Second, as previously explained, LeFever did not have sufficient legitimate income to finance his addiction. Thus, he was faced with the continual need for additional and ready cash resources. Moreover, we recognize that the need for money to support a heroin habit is categorically different than the need any of us might encounter when faced with an unexpected financial burden. Absent assistance from friends or family, the legitimate avenues of financial aid open to an addict are few, if any. The physical and mental suffering associated with heroin addiction provides a compelling impetus to resort to illegal means. Indeed, recent empirical data reflect the dramatically increased

likelihood that a person with a heroin addiction will commit a robbery.

(Footnotes omitted.) *LeFever,* at 732–33.

The empirical data referred to by the Court of Appeals was a 1982 study of California inmates, which revealed:

[P]risoners who had a heroin addiction of at least $50 a day prior to incarceration reported committing over 15 times as many robberies, 20 times as many burglaries, and 10 times as many thefts as inmates who did not use drugs. J. & M. Chaiken, *Varieties of Criminal Behavior* 160–61 (1982).

*LeFever,* at 733 n.4.

The Court of Appeals went on to hold:

In short, we conclude that, even though evidence of drug use may have some prejudicial effect, *see State v. Renneberg,* 83 Wn.2d 735, 737, 522 P.2d 835 (1974), it still may be appropriate to introduce it when it is highly probative of motive. This is especially fitting where the trial court has carefully handled the introduction of potentially prejudicial evidence. Here, the court was extremely cautious in its treatment of LeFever's drug addiction. It admonished LeFever's parole officer to identify himself only as a counselor for the defendant. Furthermore, the court gave the jury the following instruction, which restricted the use of drug–related testimony:

Evidence has been introduced in this case that the defendant was spending money to purchase drugs. You may consider this evidence only insofar as it may be relevant to his financial situation as bearing on the issue of motive or intent, but you may not consider this as evidence of defendant's character or for any other purpose.

Instruction 5. We must presume that the jury heeded the court's cautionary instruction. *State v. Wixon,* 30 Wn. App. 63, 75, 631 P.2d 1033 (1981).

In view of the highly probative nature of LeFever's heroin addiction and the trial court's cautious treatment of its prejudicial aspects, we hold that the court did not abuse its discretion in admitting evidence of the drug habit.

(Footnote omitted.) *LeFever,* at 734–35.

Noticeably absent in the majority opinion is any reference to the *Robtoy* test to be applied before the trial court will be reversed on an evidentiary ruling under ER 404(b), that is, whether the trial court abused its discretion. No reference is made, I suggest, because no abuse of discretion can be shown.

Regarding any alleged claim of abuse of discretion, this court in *State v. Blight,* 89 Wn.2d 38, 40–41, 569 P.2d 1129 (1977), stated:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. Where the decision or order of the trial court is a matter of discretion, it will not be disturbed on review except on a clear showing of abuse of discretion, that is, discretion manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.
>
> (Citations omitted.) *See also State v. Batten,* 16 Wn. App. 313, 314, 556 P.2d 551 (1976). *In short, discretion is abused only where it can be said no reasonable man would take the view adopted by the trial court. State v. Derefield,* 5 Wn. App. 798, 799–800, 491 P.2d 694 (1971); *State v. Hurst,* 5 Wn. App. 146, 148, 486 P.2d 1136 (1971).

(Italics mine.) *See also State v. Huelett,* 92 Wn.2d 967, 969, 603 P.2d 1258 (1979).

The majority has not held nor could it hold that "no reasonable person [judge] would take the view adopted by the trial court." *Huelett,* at 969. In fact, the majority recognizes that the courts which have faced the issue "have split over the admissibility of evidence of a defendant's drug addiction." Majority, at 783. Not only have courts split on the issue, the late Justice Robert Finley, a distinguished member of this court, believed in 1974 that it was a matter of *common knowledge* that narcotics addiction may lead an addict to resort to criminal activities to support his habit. In his dissenting opinion in *State v. Renneberg,* 83 Wn.2d 735, 522 P.2d 835 (1974), where the issue was the use of

drug addiction for impeachment, Justice Finley stated in a footnote:

It is of the utmost importance that it be understood that this case involves the admissibility of character impeachment testimony relating to former drug addiction; moreover, the state makes *no contention* that the admission of former drug usage extracted from the defendants was offered to prove *motive*. The question of motive is a separate and independent ground of evidence admissibility, and, therefore, is analytically unrelated to character impeachment. *See generally* 1–2 J. Wigmore, *Evidence* §§ 117–19, 385–87, 391–92 (3d ed. 1940). *It seems to be common knowledge that narcotic addiction may lead an addict to resort to criminal activities to support the habit. Clearly motive evidence introduced to establish a causal link between a drug habit and a consequential robbery is properly admissible.* In the instant case, however, there was no contention that the defendants' use of narcotic drugs motivated the robbery. If the dissenting views expressed herein were to prevail, upon retrial, *the state may establish a drug–related motive for the robbery.* The record in this case, as presently posited, reveals no suggestion that the *defendants acted out of a narcotic compulsion to feed their habit.* Therefore, admissibility of such evidence upon the independent ground of criminal motive is not properly before this court.

(Some italics mine.) *Renneberg,* at 743 n.1.

"Common knowledge" has not changed in 10 years, in my opinion, in the opinion of the trial court, and in the opinion of the Court of Appeals.

The majority apparently rejects the "common knowledge" views of Justice Finley and adopts an exclusion rule set forth in *People v. Cardenas,* 31 Cal. 3d 897, 647 P.2d 569, 184 Cal. Rptr. 165 (1982) and *Gould v. State,* 579 P.2d 535 (Alaska 1978), because those "cases and this appeal both involve convictions based upon inconsistent eyewitness testimony." Majority, at 783.

With all due respect, I believe the majority is crossing the line which separates its constitutional functions as an appellate court from the fact–finding functions of a jury.

Const. art. 1, § 22.

It is not the function of this court to attempt to weigh and determine the credibility of the testimony of any witness from a mere review of the cold trial record. It is exclusively the function of the jury to determine the weight of the evidence and the credibility of the testimony of any witness. This court, as an appellate court, may not substitute its judgment for that of the jury.[3]

In referring to *Cardenas,* the majority states that the California court "was bothered by the closeness of the case" where "not a single witness was able to identify the defendant consistently in mug shots and a pretrial lineup." Majority, at 783.

Here, the defendant was *positively identified* by all three victims of the three separate robberies at a lineup on October 21, 1981. And, all three victims *positively* identified defendant in open court during the trial as the person who committed the robberies. Teresa Lembeck, also present during the third robbery, was 90 percent sure defendant was the robber at the lineup and 100 percent sure on a "lot of points" at trial. Report of Proceedings, at 225, 227.

The evidence further established that the robber left the scene of each of the crimes driving a light blue Volkswagen. Defendant owned a light blue Volkswagen and was, in fact, stopped in the vicinity of the third robbery by a Seattle police officer but was released because his clothing did not match the description. Again, that is circumstantial evidence to be considered *by the jury.*

The majority states that when, "as here, identification is crucial and eyewitness testimony as to identity is confused

---

[3]The jury was instructed here, as it is in every criminal or civil case:

You are the sole judges of the credibility of the witnesses and of what weight is to be given the testimony of each. In considering the testimony of any witness, you may take into account the opportunity and ability of the witness to observe, the witness' memory and manner while testifying, any interest, bias or prejudice the witness may have, the reasonableness of the testimony of the witness considered in light of all the evidence, and any other factors that bear on believability and weight.

Instruction 1; *see* WPIC 1.02, WPI 1.02.

at best, it is error for the prosecution to introduce evidence of defendant's addiction to heroin." Majority, at 785.

Here, as stated above, the eyewitness testimony of the victims *on the issue of identity is not confused.* It is consistent and positive that defendant LeFever committed each of the three robberies. The so–called inconsistency referred to by the majority arises because some witnesses testified the robber had a moustache; others could not recall a moustache. *That is what the majority views as the critical issue,* not whether the victims were able to positively identify the defendant.

### The Majority's Moustache Issue

On the "moustache issue" the majority states:

> Defendant's witnesses testified LeFever had a prominent moustache when the robberies occurred. Because of the robber's disguises, however, some eyewitnesses to the crime remembered the robber with a moustache, while others did not.

Majority, at 784–85. As far as the first two robberies committed on September 5 and 7, 1981, are concerned, there was testimony of defendant's witnesses that *he had a moustache.* The victims of these robberies could not remember whether the robber had a moustache. The reasons why the victims could not remember are obvious from a reading of the testimony. As presumably intended by the robber, both were scared and somewhat distracted by the disguises.

### September 5, 1981, Robbery

When the victim, Hennie McFarlane, first saw the person who later robbed her, she was concerned about his condition because Band–Aids were under each of his eyes and cotton was stuffed up both nostrils making his nose huge. She testified:

> I was looking for bruises on his face because I thought, well, the poor man had been into an accident, you know, and probably needed his check cashed.

Report of Proceedings, at 48.

She was scared not only for herself during the robbery, but for a young boy who was standing nearby. The robber told her he had a .357 magnum beneath his shirt, and, after asking McFarlane if she could see a little 7– or 8–year–old boy nearby, said:

"'I'll blow his head off if you don't give me all your money.'"

Report of Proceedings, at 49.

The jury apparently placed more weight on her positive identification of defendant during the lineup and in court rather than on her failure *to recall* whether he had a moustache. Under the circumstances I agree.

### September 7, 1981, Robbery

When the victim, Debra Limb, first saw the robber she believed he looked strange with sideburns scotch–taped to his face. He had Band–Aids on his face and looked like he had been in a fight. She likewise was scared. The robber told her he had a .357 magnum and wanted all the money. Ms. Limb didn't remember if he had a moustache. Although Ms. Limb could not remember the moustache, she positively identified defendant.

There were two other witnesses in the store at the time who were not the victims of the crime and who were not threatened with the .357 magnum. Both testified the robber had a moustache in addition to the other marked disguises. One remembered a cowboy hat. Neither of these witnesses identified the defendant. In fact, one testified she did not believe the defendant was the robber.

Perhaps the jury believed the recollection of these two nonthreatened witnesses that the robber had a moustache, believed the testimony of defendant's witnesses that on that date he had a moustache, and believed the positive identification of defendant by Ms. Limb. The jury decided the issue, and the matter was exclusively within its province.

### October 17, 1981, Robbery

The crime was committed at about 1:20 p.m. on Satur-

day. Mrs. LeFever, defendant's wife, testified that defendant left the apartment after noon to go purchase drugs on Madison Avenue. She did not see him for approximately 24 hours. He was scheduled to work at 4 p.m. that afternoon.

The primary victim of the third robbery was Leonard Wayne Bloom. He recalled the robber had a full fake beard, an artificial wart, and a straw cowboy hat. He saw a gun, and the robber demanded the money, "or I'll blow off your . . . head." Report of Proceedings, at 162. Mr. Bloom could not recall if the robber had a moustache. But, as stated before, he positively identified defendant in a lineup and in open court as the robber.

Teresa Lembeck, an employee of the Ballard Safeway store, was nearby when the robbery occurred. She was scared, but could remember the straw cowboy hat, the fake beard, and two fake warts. She didn't remember a moustache.

The majority fails to mention that even defendant's wife, when asked, could not remember if defendant had a moustache on October 17, 1981. She testified he had one on September 5, 1981, but that he shaved it off a month or 6 weeks later. She said he was without a moustache for about 2 or 3 days. Detective Charles McClure, who was present when defendant was arrested 3 days after the third robbery on October 20, 1981, was asked at trial if defendant had a moustache the night of the arrest. His response was: "He was growing one." Report of Proceedings, at 319.

Of course, prior to the lineup on October 21, 1981, defendant shaved off any moustache.

Counsel for defendant argues that exhibit 30, a photograph taken on the date of the arrest, shows the moustache. Unfortunately, *none of the exhibits are before this court* for review. However, the jury considered the testimony and *all* exhibits prior to returning its verdict of guilty.

The failure of the victims to recall whether the robber had a moustache on the three separate dates of the robberies (if, in fact, he had one on the date of the last robbery) apparently was not considered by the jury as being critical

to the State's case in light of all the evidence presented, *including the positive identification of defendant by all three victims.*

### The Need for Money—Motive for Commission of the Robberies

After his arrest defendant admitted to his parole officer (identified before the jury as defendant's counselor to avoid prejudice) that he had a $125–a–day heroin habit, but that he had made arrangements to enroll in a drug rehabilitation program the next day. Defendant also told the officer his wife was providing him with money to buy the heroin *during the 5–day waiting period* before entry in the Veterans Administration Methadone Maintenance Program. *At the time of his arrest he was earning* $1,400 per month, and his wife's earnings totaled $320 per month. In his affidavit filed in support of a new trial, defendant stated, if he had been allowed to testify without the prior robbery convictions being used for impeachment, he would have testified that: (1) he had been using heroin for approximately 3 weeks; (2) he started out spending approximately $20 per day on heroin; (3) he occasionally obtained his heroin by selling drugs to others; and (4) he used a $600 settlement for damages to his car to purchase heroin.

The majority concludes:

> This testimony would support defendant's claim that the funds used to purchase heroin were from sources other than the proceeds of the robberies.

Majority, at 781.

Defendant's theory that he had independent funds to pay for his habit was presented to the jury—other than the evidence of his drug sales to support his habit and use of the alleged $600 settlement. In respect to the latter, no explanation has been provided as to why, if such settlement was made as claimed, the adjuster was not called to present testimony on the matter.

It appears to me that in his affidavit defendant established a need for money beyond that legally available

because he had resorted to selling drugs to help support his habit.[4] Furthermore, the record is not clear as to whether defendant was employed at his $1,400 per month job in early September when the two robberies were committed. Defendant did not mention his employment in his affidavit but did say his wife was providing him money for drugs. However, defendant's wife testified he was employed at Todd's Shipyards in September 1981. On the other hand, plaintiff's exhibit 1, a letter from the Personnel Department of Todd's Shipyards, apparently stated "that Mr. LeFever was not an employee of this company in September of 1981." Report of Proceedings, at 30. Unfortunately, as stated before, none of the exhibits are before this court, and the reference to the critical employment period was obtained from colloquy which occurred prior to the exhibit being admitted by stipulation.

The reason why three robberies were committed during a short period of time to obtain money for the drugs is because the first two yielded little money to feed an expensive habit: September 5, 1981—$120; September 7, 1981—$300; and October 17, 1981—$553.

The majority apparently has rejected Justice Finley's "common knowledge" view to establish the link between heroin addiction and the commission of robberies. The majority also apparently has rejected the results of the California study cited by the Court of Appeals and referred to earlier herein. But perhaps the best evidence of the link between defendant's heroin addiction—the need for money—and the commission of crimes, can be otherwise established on the basis of the record before this court, particularly the record of the habitual criminal proceedings[5] and the revocation proceeding.

---

[4]Here, defendant repeated the same criminal conduct which led to his 1972 conviction of possession with intent to distribute heroin. See discussion herein on the habitual criminal issue.

[5]Unfortunately the exhibits admitted in evidence—the documentary evidence of the pleas and convictions—and the only evidence considered by the trial court

The record discloses that since the early 1970's defendant LeFever has had a serious heroin addiction which he acquired in the military, and over the years has resorted to crime to feed his habit. At the time of his first appearance before any court—prior to his conviction in 1971, his attorney, in the habitual criminal proceeding, referred to his addiction and the fact that he was on methadone. His second conviction in 1972 was for possession with intent to deliver heroin. In 1974 he entered a plea of guilty to three counts of robbery in an information which contained 15 counts.

Again, in the habitual criminal proceeding, counsel referred to the defendant's drug problem and his understanding and belief that, upon the pleas to the three robbery counts he would be placed in a drug treatment program. Instead he was sentenced to prison.

While he was on parole in 1980, defendant entered a plea of guilty to the crime of possession of stolen property in the second degree. The reason for the crime was to obtain money for drugs, even though he was employed at the time earning good wages.

On May 28, 1980, defendant appeared before Judge Carolyn R. Dimmick in King County Superior Court for sentencing.[6] His attorney advised Judge Dimmick that defendant had a "superb marital situation." Clerk's Papers, at 13. He stated defendant's employer considered him an "excellent worker" and that he could return to work where he could earn $10.50 an hour as a scaler and machinist.[7] Clerk's Papers, at 13. Counsel noted his constructive work,

---

in the habitual criminal proceeding were not made a part of the record presented for review. I believe the documents admitted would show clearly the "link" in defendant's case.

[6]Judge Dimmick was later appointed to this court and for obvious reasons disqualified herself from sitting on this appeal.

[7]At 8 hours a day, 40 hours a week for 4 weeks, this would amount to over $1,680 a month. The amount was insufficient to pay for the drugs in 1980, and his and his wife's wages were insufficient again in September and October 1981.

but said:

> Then he gets hung up again on the drugs and he loses his momentum and his sense of propriety and he turns to this kind of monkey business and this kind of behavior.

Clerk's Papers, at 13–14.

In responding to the judge's question if there was anything he would like to say, defendant said:

> Sometimes it's really a rude awakening—throughout the course of this whole ordeal I almost lost my wife because of this whole ordeal. I had marital problems over that. It's been a rude awakening and *it's caused me to restrengthen my commitment to live a drug–free life.*

(Italics mine.) Clerk's Papers, at 15.

The court accepted the recommendation of the probation staff and the office of the prosecuting attorney in granting a 5–year suspended sentence with several conditions. As far as the drug problem was concerned, the court said:

> One of the conditions, obviously, will be that you continue with your methadon[e] maintenance program and remain drug–free. . . . If you do not follow the conditions, you will go directly to the penitentiary. This is the one–time chance you have to convince us you are sincere.

Clerk's Papers, at 16–17.

That was on May 28, 1980. The crimes here were committed in September and October 1981. The pattern is consistent. Defendant needed money for drugs. Defendant's history is consistent with the results of the California study and the view expressed by Justice Finley in *State v. Renneberg*, 83 Wn.2d 735, 522 P.2d 835 (1974).

The trial court, as stated by the Court of Appeals, did not abuse its discretion *in this case* in admitting evidence of drug addiction to establish the motive (the need for money) for the commission of the three robberies.

## II
### DOUBLE JEOPARDY CLAUSE NOT APPLICABLE IN HABITUAL CRIMINAL PROCEEDINGS

Defendant contends that the trial court's reconsideration and reversal of its oral decision dismissing his habitual

criminal charge must be set aside as violative of the double jeopardy clause of the fifth amendment to the United States Constitution and Const. art. 1, § 9. The majority agrees. I disagree.

On the basis of the record, I cannot understand why the majority reaches and decides the constitutional double jeopardy issue. The majority reverses the robbery convictions upon which the habitual criminal finding, in part, was based. Therefore, it follows, the finding would have to be set aside. Be that as it may, I will have to address the issue, because, as stated earlier, I would affirm the robbery convictions.

In fairness to the trial court and the Court of Appeals, it must be noted that, although the constitutional double jeopardy argument is properly before this court, it was presented for the first time in defendant's petition for review filed with this court. *State v. McCullum,* 98 Wn.2d 484, 487, 656 P.2d 1064 (1983).

The only case cited by defendant in support of his argument is *State v. Hennings,* 100 Wn.2d 379, 670 P.2d 256 (1983), which was filed by this court on October 6, 1983, approximately 1 month after the Court of Appeals decided *State v. LeFever,* 35 Wn. App. 729, 669 P.2d 1251 (1983), filed September 12, 1983. Without explanation, the majority does not cite or discuss *Hennings.* The majority apparently simply prefers to extend the holding of *State v. Dowling,* 98 Wn.2d 542, 656 P.2d 497 (1983) to habitual criminal proceedings.

The habitual criminal charge was filed after defendant was convicted of the three counts of robbery. In addition to the robbery convictions the supplemental information alleged the following: (1) a 1971 conviction of forgery in the first degree; (2) a 1972 conviction of possession with intent to distribute heroin; (3) a 1974 conviction of three counts of robbery; and (4) a 1980 conviction of possessing stolen property in the second degree.

The matter came on for hearing on May 17, 1982. Documentary evidence of the convictions was presented to the

court along with briefs submitted by counsel. *No testimony was presented by either party.*

At the conclusion of the hearing the trial court initially orally ruled "[o]n the basis of the argument and . . . study of the cases, the Court grants the motion to dismiss the habitual criminal proceeding." Report of Proceedings, at 41. Three days later on May 20, 1982, the State noted a motion "for reconsideration or in the alternative further ruling". Report of Proceedings, at 46. Counsel for the State advised the court:

> I noted the motion in this case for reconsideration or in the alternative further ruling, and the fact that *I think both counsel felt* that the Court had not ruled on the two outstanding convictions, . . . which I believe was Count I, and the Count IV Federal bank robbery conviction, and in my motion I have noted the requirements are only two prior convictions.

(Italics mine.) Report of Proceedings, at 46.

Counsel for defendant stated:

> MR. HANSEN: Your Honor, I would like to correct the prosecutor on *one matter.* There is no bank robbery conviction. The 1971 Federal conviction was for possession of heroin with intent to distribute.

(Italics mine.) Report of Proceedings, at 46.

> MR. HANSEN: . . . Basically, your Honor, what the Court would have to find to enter an habitual criminal finding is that there are, in addition to that conviction, that most recent one [the three counts of robbery in the instant case], that there are two prior valid guilty pleas. THE COURT: All right. Maybe I misunderstood at the time. There were four convictions before me. MR. HANSEN: That's correct. MR. CHERRY [Deputy Prosecutor]: Actually five, including the most recent and four prior to that most recent. . . . THE COURT: All right. The two, the only two that I *looked at and made a substantive ruling on were the two that I mentioned in my oral decision.* . . . If indeed there are five convictions, *then I need to look at the other two.* MR. HANSEN: *That's correct, your Honor,* and the State would have to prove that both of those two are valid and usable in this proceeding in order *to sustain its burden of proof.*

(Italics mine.) Report of Proceedings, at 48–49.

The trial court then granted the motion for reconsideration, and because of the request of counsel for defendant for an early decision, the court set the matter for argument May 21, 1982.

After argument, the court reviewed the existing documentary evidence and determined the State had sustained its burden of proving beyond a reasonable doubt that defendant is a habitual criminal.

In *Hennings* a majority of this court held that in a habitual criminal proceeding when a trial court determines that the State has not met its burden of proving beyond a reasonable doubt *the validity of a previous conviction,* the double jeopardy clause prevents the State *from relying on that previous conviction* to prove habitual criminal status in any subsequent proceeding.

Although I disagree with the holding in *Hennings* because I do not believe the double jeopardy clause applies in a habitual criminal proceeding, *Hennings* is clearly distinguishable here on its facts. In *Hennings* the State sought to introduce *additional* evidence at a requested hearing after the court had determined the State had failed to prove beyond a reasonable doubt the validity of an earlier conviction. The trial court denied the rehearing, and the State appealed. This court affirmed. Here, the State offered *no new evidence.* The court, at what appears to have been the request of both counsel, simply and properly passed on the validity of convictions which were in evidence but upon which the court had not previously ruled. The State had a right to a ruling on each of the convictions upon which the habitual crime charge was based.

I believe the court now, as in *Hennings,* is extending the double jeopardy clause far beyond the protection intended. The double jeopardy clause of U.S. Const. amend. 5 states that: "nor shall any person be subject for the *same offense* to be twice put in jeopardy of life or limb . . ." (Italics mine.) Const. art. 1, § 9: "No person shall . . . be twice put in jeopardy for the *same offense.*" (Italics mine.)

Prior to *Hennings* this court consistently held that a person charged with being a habitual criminal was not charged with an *offense*; therefore, the double jeopardy clause did not apply. *State v. Braithwaite,* 92 Wn.2d 624, 600 P.2d 1260 (1979) *overruled in Hennings.*[8] In *Braithwaite,* this court in a unanimous decision held:

> Those constitutional provisions protect an individual against repeated trials for the same "offense." A determination that one is a habitual criminal does not involve a finding that he is guilty of an offense but only a finding that he has previously been convicted of certain offenses. That finding is usually, if not invariably, based upon judicial records and establishes a status, not an offense. *State v. Persinger,* 62 Wn.2d 362, 382 P.2d 497 (1963), *appeal dismissed,* 376 U.S. 187 (1964). We have held that one charged with being a habitual criminal is not thereby charged with a substantive crime but merely with having a *status,* which, if proven, calls for increased punishment for the latest crime of which the accused has been convicted. *In re Towne,* 14 Wn.2d 633, 129 P.2d 230 (1942).

*Braithwaite,* at 625.

In *Hennings,* decided 4 years after *Braithwaite,* the majority in extending the double jeopardy provision beyond its plain meaning, based its decision, at least in part, upon the holding of the United States Supreme Court in *Bullington v. Missouri,* 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852 (1981). Suffice it to say, in my opinion, *Bullington,* which involved a special death penalty proceeding did not, and does not, require extension of the double jeopardy provision to a habitual criminal proceeding. Death penalty cases, as this court has recently stated, are "different". *State v. Frampton,* 95 Wn.2d 469, 478, 529–30, 627 P.2d

---

[8]Included in the long line of cases of this court recognizing that a habitual criminal charge does not allege a crime or an offense but simply a "status" which, when proven, results in increased punishment, are: *State v. Gilcrist,* 91 Wn.2d 603, 590 P.2d 809 (1979); *State v. Tatum,* 61 Wn.2d 576, 379 P.2d 372 (1963); *State v. King,* 18 Wn.2d 747, 140 P.2d 283 (1943); *In re Towne,* 14 Wn.2d 633, 129 P.2d 230 (1942); *State v. Johnson,* 194 Wash. 438, 78 P.2d 561 (1938); *State v. Le Pitre,* 54 Wash. 166, 103 P. 27 (1909).

922 (1981); *see also State v. Bartholomew,* 101 Wn.2d 631, 683 P.2d 173 (1984).

Two cases have held that *Bullington* is distinguishable because it involved death penalty proceedings, and that the double jeopardy clause therefore does not bar a second habitual criminal hearing. The first case was decided before this court's decision in *Hennings,* but was not cited in the parties' briefs. *Linam v. Griffin,* 685 F.2d 369 (10th Cir. 1982), *cert. denied,* 459 U.S. 1211 (1983). *Linam* involved New Mexico's Criminal Act, which is similar to Washington's in all important respects. The *Linam* court noted that there is "a qualitative and quantitative difference" between a habitual criminal hearing and death penalty sentencing, and stated: "This uniqueness of the death penalty unquestionably serves to distinguish [*United States v.*] *DiFrancesco* [449 U.S. 117, 66 L. Ed. 2d 328, 101 S. Ct. 426 (1980)] from *Bullington.*" *Linam,* at 375. In the second case, a Missouri court reached the same conclusion, stating: "In short, the death penalty second stage trial in a capital murder case bears no similarity to a determination of persistent offender status by a judge upon the basis of largely formal evidence." *State v. Lee,* 660 S.W.2d 394, 400 (Mo. Ct. App. 1983). I agree with these decisions and would hold that *Bullington* has no application in a case such as this.

In *State v. Dowling,* 98 Wn.2d 542, 656 P.2d 497 (1983), the juvenile was charged with the *crime* of theft. At the conclusion of the trial, the court on motion of defendant orally dismissed the charges. The court granted the State's motion for reconsideration and later found the defendant guilty. On appeal, this court reversed, stating:

> The double jeopardy clause protects a citizen from being placed in the hazardous position of standing trial more than once for *the same offense.*

(Citation omitted. Italics mine.) *Dowling,* at 543.

The court went on to establish the "rule", as quoted in the majority opinion at pages 787–88:

> A finding by the court as the trier of fact, without a jury, when read conclusively into the record in such a

manner as to indicate that it is neither tentative nor made with reservation or advisement nor subject to further consideration or proceedings in the same case, will support a judgment of acquittal or dismissal.

*Dowling,* at 547, quoting *State v. Bastinelli,* 81 Wn.2d 947, 956, 506 P.2d 854 (1973) (Hale, C.J., concurring).

The reasoning of the *Dowling* court was that when "a defendant is acquitted of a *crime,* a trial judge cannot later find such innocent person guilty of the *same crime."* (Italics mine.) *Dowling,* at 548.

In the instant case, the majority, without any discussion or reasoning and without considering the basis for the ruling in *Dowling,* simply states: "We hold this same rule also applies to habitual criminal proceedings." Majority, at 788.

I strongly disagree. The majority, as in *Hennings,* is not interpreting the double jeopardy provision in accordance with its plain language. The majority, without even quoting the language of the constitutional provision, is rewriting the same and extending the holding of *Dowling* (a case where a *crime* was charged) to apply the "double jeopardy" provision in this habitual criminal proceeding, where: (1) the evidence was solely documentary; (2) the trial court only initially made a substantive ruling as to two of four convictions in evidence; and (3) when requested, the trial court simply reconsidered and provided a ruling upon the other two.

This case may be distinguished from *Hennings* and obviously is distinguishable from *Dowling* which was not a habitual criminal case. However, if necessary, I would overrule *Hennings.* In my opinion, a defendant in a habitual criminal proceeding cannot be placed in jeopardy for the second time for the same *offense* or crime (within the meaning of U.S. Const. amend. 5 or Const. art. 1, § 9), because he never was placed in jeopardy for an *offense* or crime in the first instance. *Braithwaite* should not have been overruled.

One other matter that concerns me regarding the majority's double jeopardy ruling is its impact on any subsequent

habitual criminal proceeding which may be instituted against defendant.

Of the four prior convictions of defendant set forth previously, the trial court determined the 1971 and 1972 pleas were valid and, with the convictions of robbery in the instant case, established beyond a reasonable doubt defendant's status as a habitual criminal. Thus, the trial court in its findings of fact determined that it was unnecessary to rule on the validity of the plea in the 1980 possession of stolen property case. Finding of fact 4. It held the State had failed to prove beyond a reasonable doubt the validity of the 1974 plea.

Obviously, under *Hennings* and the majority opinion herein, the 1974 conviction would be barred by the double jeopardy clause from being used by the State in any subsequent habitual criminal proceeding. What about the other three, the two which the court used (the 1971 and 1972 convictions) and the 1980 conviction which counsel for defendant argued could not be considered because it was on "appeal"?[9]

The majority should clearly and definitely state its holding to avoid any unnecessary confusion which may lead to an unnecessary appeal.

## III
### REVOCATION OF 1980 PROBATION

With the reversal by the majority of the robbery conviction upon which the State sought revocation of the defendant's 1980 probation, the case will have to be remanded for a new probation revocation hearing. *State v. Dowell,* 26 Wn. App. 629, 632, 613 P.2d 197 (1980).

I would affirm the robbery conviction. Accordingly, I would affirm the revocation of probation.

For the reasons stated herein I must dissent.

---

[9]It should be noted that with the enactment of the new sentencing act, the habitual criminal statute, RCW 9.92.090, applies only to crimes committed before July 1, 1984. RCW 9.92.900.