Filed 9/23/15  P. v. Jimenez CA3
Received for posting 10/27/15

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C077694 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF143525) |
| v. | |
| SALVADOR JIMENEZ, | |
| Defendant and Appellant. | |

Defendant Salvador Jimenez was charged with robbing or attempting to rob seven people at six small businesses in Woodland.  The jury found him guilty of five of those charges, acquitted him of one, and was unable to reach a verdict on another.  Appealing from his conviction, defendant contends:  (1) there was insufficient evidence he was the perpetrator; (2) the court erred in admitting evidence he was a homeless drug addict; (3) the court erred in denying his motion for mistrial; and (4) the court erred in instructing on eyewitness identification.  Finding no prejudicial error, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

A

*Robbery Of Marisol Ortiz At Razz Yogurt*

*Count 7--Guilty*

On July 7, 2014, Marisol Ortiz was working at Razz Yogurt on Main Street in Woodland when a man came into the store wearing a hat and sunglasses, with a piece of paper covering his mouth. He came up to the counter, told Ortiz to give him the money, and said he had a gun. His left hand was in his pocket, and there was something bulky inside. She removed about $300 from the cash register, and the man took it and fled on a bike. A couple of weeks later, Ortiz picked out defendant as the robber from a photographic lineup. Ortiz also identified defendant as the robber during trial.

B

*Robbery At Sally Beauty Supply*

*Count 6 Robbing Teresa Michel--Guilty & Count 5 Robbing Lisa Lucero--Guilty*

On July 10, 2014, Teresa Michel and Lisa Lucero were working together at Sally Beauty Supply on Main Street in Woodland when a man came into the store wearing a baseball cap and sunglasses, with a paper towel covering his mouth. He had a zippered pouch under his arm. He came up to the counter and said, "I'm going to make this short but sweet . . . give me the money." He told them he had a gun and pulled out the gun half way from the zippered pouch. Michel and Lucero quickly took out a little less than $200 and handed it to the man. Michel and Lucero both separately identified the robber as defendant from a photographic lineup and then at trial.

C

*Robbery Of Dorothy Olsen At College Drive-In Cleaners*

*Count 4--Not Guilty*

On July 14, 2014, 86-year-old Dorothy Olsen was working at College Drive-In Cleaners on College Street in Woodland when a man came into the store wearing a

2

baseball cap and sunglasses and a tan-colored bag near his face. Olsen asked if she could help him, and he calmly said, "I want your money." Olsen responded, "why would you want to do such a thing as that?" "[Y]ou'll end up being picked up and be put in jail, and that is not a nice life to have . . . we don't have much money in this store, but you can go to the grocery store, they have lots of money." The man responded, "I could take you down," to which Olsen asked, "Why would you want to do a stupid thing like that?" But, Olsen "decided [she] better give him the money" and gave him about $170 to $200 from the cash drawer. Olsen was unable to identify the robber as defendant from a photographic lineup, but she identified the robber as defendant at trial.

D

*Robbery of Marissa Torix At Papa Murphy's*

*Count 3--Guilty*

On July 16, 2014, Marissa Torix was working at Papa Murphy's on Main Street in Woodland when a man came into the store wearing a baseball cap, sunglasses, and a medical mask and told her to empty the register or he would pull out a gun. She emptied the register and gave the man about $155, and the man fled on a bike. Torix picked out defendant as the robber from a photographic lineup. Torix also identified defendant as the robber during trial.

E

*Attempted Robbery of Faviola Ochoa At Jack In The Box*

*Count 2--Guilty*

On July 18, 2014, Faviola Ochoa was working at Jack in the Box on East Main Street in Woodland when a man came into the restaurant wearing a cap, dark glasses, a cup lid covering his mouth, and holding a pouch in his hand. The man said she needed to open the cash register and if she didn't, he was going to pull a gun on her. Ochoa responded that she needed to take some tacos out of the oven or they would burn, told him to stay, and then she went back to see her manager. He stayed for about three

3

minutes and then left the restaurant. Ochoa was unable to pick out defendant as the robber from a photographic lineup or during trial. But police were able to get a still picture of the robber from the store security video camera.

F

*Robbery Of Dania Amador At Jimboy's Tacos*

*Count 1--Jury Unable To Reach A Verdict*

On July 19, 2014, Dania Amador was working at Jimboy's Tacos on Court Street in Woodland when a man came into the restaurant wearing a hat, glasses, and a napkin up to his face. The man told her, "don't make a scene, just give me all the money." She thought he had a gun because he put his hand on his waistband. She gave him about $200. Amador picked out defendant as the robber from a photographic lineup when police showed her the lineup, but at trial, she could not remember whom she had picked out.

G

*Identification Of Defendant As The Robber*

*By His Brother And Stepfather*

Police put together a press release about the robberies containing the still photograph of the robber.

On July 21 or 22, 2014, defendant's brother saw the press release, recognized defendant in the photograph, and called police. Earlier, on July 16, 2014, the brother had seen defendant near Papa Murphy's in Woodland sitting on his bicycle wearing a surgical mask.

Also on July 21 or 22, 2014, defendant's stepfather saw the same press release and called police to say he recognized the photograph as being defendant.

The brother and stepfather called police separately, without knowledge of the other one doing so.

4

H

*Defendant's Arrest And Interview With Police*

On July 22, 2014, Woodland Police Officer Pablo Gonzales arrested defendant on West Court Street in Woodland. Defendant was carrying the black satchel that was used by the perpetrator of the Sally Beauty Supply robbery and Jack in the Box attempted robbery. Inside the satchel was a hat and sunglasses and a methamphetamine pipe with drug residue. Defendant had in his jacket a black toy gun that looked like a real semiautomatic handgun.

Woodland Police Detective Greg Ford interviewed defendant at the police station. Defendant denied he was the robber. He admitted using methamphetamine daily. He had been living at his parents' house, then was evicted from an apartment he had moved into, and now had been transient for two months.

DISCUSSION

I

*There Was Sufficient Evidence To Establish*

*Defendant As The Perpetrator Of The Robberies*

Defendant claims there was insufficient evidence to establish he was perpetrator of the robberies for the following two reasons: (1) "[n]o physical or forensic evidence connected [him] to the crime[s]"; and (2) "[t]he various eyewitness identifications of [him] . . . were inherently improbable, unbelievable per se." Not so.

Contrary to defendant's first point, there was physical evidence connecting him to the robberies. When Officer Gonzales arrested defendant, defendant was carrying the black satchel that was used by the perpetrator of the Sally Beauty Supply robbery and Jack in the Box attempted robbery. Inside the satchel were a hat and sunglasses that were consistent with the modus operandi used in the robberies. Defendant also had in his jacket a black toy gun that looked like a real semiautomatic handgun. That was

5

consistent with Lucero's testimony that she saw defendant pull out something that resembled a gun during the Sally Beauty Supply robbery.

And contrary to defendant's second point, there was nothing "inherently improbable" or "unbelievable per se" about the witness identifications. Four of the robbery victims (Ortiz, Michel, Lucero, and Torix) identified defendant as the perpetrator both from the photographic lineup before trial and then during trial as the perpetrator, and separately defendant's brother and stepfather reported to police that they recognized defendant as the person in the press release photo concerning the robberies.

## II

### *The Court Erred In Admitting Evidence Of Defendant's Drug Use And Homelessness; These Errors Were Harmless Beyond A Reasonable Doubt*

Defendant contends the court violated his due process right to a fair trial when it admitted evidence he was a homeless drug addict, arrested with a methamphetamine pipe. This was error, but there was no prejudice.

The court admitted the evidence after the People had argued that the drug use evidence was relevant to prove motive and defendant's transient status was relevant to rebut the defense argument that the police were derelict in not executing search warrants to look for stolen property at a specific address. In admitting this evidence, the trial court specifically found that the probative value of the evidence was not outweighed by any possible prejudicial effect.

### A

### *The Court Erred In Admitting Evidence Of Drug Use To Prove Motive*

As to the evidence of defendant's drug use to prove motive, it was error to admit it. The California Supreme Court has held that "evidence of an accused's narcotics addiction is inadmissible where it 'tends only remotely or to an insignificant degree to prove a material fact in the case . . . .' " (*People v. Cardenas* (1982) 31 Cal.3d 897, 906.) Cases that have upheld the admission of evidence of an accused's narcotics addiction

6

involve situations where the accused was charged with a violation of the Health and Safety Code or where obtaining narcotics was the direct object of the crime committed. (*People v. Morales* (1979) 88 Cal.App.3d 259, 264 [possession of heroin]; *People v. Copeland* (1959) 169 Cal.App.2d 713, 715 [forgery of drug prescription]; *People v. O'Brand* (1949) 92 Cal.App.2d 752, 754 [burglary of drug store to steal narcotics].) However, in cases where the object of the charged offense was simply to obtain money, evidence of the accused's narcotics use has been found inadmissible because of the inflammatory effect of such testimony. (*People v. Davis* (1965) 233 Cal.App.2d 156, 161-162 [robbery of money from liquor store]; *People v. Enriquez* (1961) 190 Cal.App.2d 481, 485 [attempted robbery of money from grocery store].)

B

*The Court Erred In Admitting Evidence Of Defendant's Transient Status Because There Was No Suggestion The Police Should Have Done More With Regard To The Search*

In arguing for admissibility of defendant's transient status, the prosecutor contended, "the jury deserves to be given [a] reason" "why the police did not execute search warrants at a particular residence looking for stolen property" "when we have evidence as to why." The prosecutor's reason for wanting in this evidence was "just when I look at where the possible arguments come at the end, I don't want to be left without knowing." On appeal, the People take this argument further by stating that this evidence was introduced "in response to a defense theory noting the absence of the recovery of any stolen property."

The problem with this argument is there was no suggestion that the police did an inadequate job of searching a residence to find stolen property or for that matter, that defendant stole property other than money that could be retrieved at a fixed residence. Thus, there was no basis in reason to admit defendant's transient status to rebut an argument that had never been made. Indeed, in closing arguments, the defense never

7

suggested that the police investigation was deficient because they had failed to search a residence or anything along those lines.

C

*The Errors In Admitting This Evidence Were Harmless*
*Under Any Prejudice-Based Standard Of Review*

Despite the two evidentiary errors here, we find them harmless under any prejudice-based standard of reversible error. (*Chapman v. California* (1967) 386 U.S. 18, 22-23 [17 L.Ed.2d 705, 709-710] [harmless beyond a reasonable doubt standard]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [reasonable probability of a different result standard].)

The evidence of defendant's guilt was overwhelming for the robberies for which the jury found him guilty. Four of the robbery victims identified defendant as the perpetrator in the photographic lineup and at trial, and two of his family members identified him as the robber, as well. He was caught by police carrying the black satchel used in the Sally Beauty Supply robbery and Jack in the Box attempted robbery. Inside the satchel were the hat and sunglasses used by the perpetrator. Defendant also had in his jacket a realistic black toy gun used during the Sally Beauty Supply robbery.

Moreover, the evidence of defendant's drug habit and transiency was a very minor part of the trial, both in terms of the time it consumed and the emphasis it was given by the People. Officer Gonzales testified that he found a methamphetamine pipe with drug residue in the black satchel. Detective Ford testified defendant told him he was a daily user of methamphetamine and that he had previously been living at his parents' house, then was evicted from an apartment he had moved into, and now had been transient for two months. In all, this testimony was about six pages long out of a trial that covered about 250 pages of testimony. And the use to which it was put in closing argument by the People was minimal. Basically, what the People argued twice for a few sentences in closing was the following: it was reasonable to believe that a person such as defendant,

8

who was a transient with a drug habit, would rob the victims here. And this was only a small part of a reasonableness argument that included emphasizing other facts such as the strong eyewitness identification by victims and family and the fact that defendant had a fake gun on him and thus targeted only women.

Finally, the evidence of defendant's drug use and transiency appeared not to have prejudiced defendant because the jury acquitted him of robbing Olsen at College Drive-In Cleaners and could not reach a verdict on whether he robbed Amador at Jimboy's Tacos.

III

*The Court Did Not Abuse Its Discretion Or Deny Defendant His Constitutional Rights In Denying His Mistrial Motion*

Defendant contends the court deprived him of his due process right to a fair trial when it denied his motion for mistrial following a comment made by Dorothy Olsen. Specifically, as Olsen was leaving the witness stand, she asked the court if she could make one comment. Despite the court telling her, "Nope," Olsen said, "I feel sad for the person but the trouble is" "[w]e don't want him out on the road to do this again." Defense counsel objected and asked the court "to admonish the jury to have that stricken." The court responded, "Members of the jury, that extra comment that you just heard, please, put that out of your mind. You are to not consider it in any way." The next day, defense counsel moved for a mistrial because she "d[id]n't think that the Court's admonishment [was] enough." The court denied the motion because it was "satisfied that the instruction given to the jury would suffice under the circumstances."

There was no error, constitutional or otherwise, in the court's denial of the motion for mistrial. Whether examined under California state law for an abuse of discretion (*People v. Elliott* (2012) 53 Cal.4th 535, 575) or under federal law for a due process violation (*People v. Partida* (2005) 37 Cal.4th 428, 439, citing *Estelle v. McGuire* (1991) 502 U.S. 62, 70 [116 L.Ed.2d 385]), the court's resolution of the mistrial motion does not require reversal.

Olsen's comments were brief and not damaging. She said only, "[w]e don't want him out on the road to do this again," and tempered that somewhat by noting she felt sorry for him. This was not a situation in which the witness imparted inflammatory evidence to prejudice the jury. (Cf. *People v. Ozuna* (1963) 213 Cal.App.2d 338, 341 [police officer "calculat[ing]" reference to defendant as an "ex-convict"].)

Moreover, the court told the jury at once to disregard the statement and then again at the end of the trial instructed, "if I ordered testimony stricken from the record, you must disregard it and must not consider that testimony for any purpose." The court also instructed the jury at the end of trial "not [to] let bias, sympathy, prejudice, . . . or public opinion influence your decision." We must presume the jury followed the court's instructions. (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9.)

Finally, the jury found defendant not guilty of the robbery involving Olsen at College Drive-In Cleaners, which greatly undercuts any argument of prejudice because of Olsen's gratuitous comments.

IV

*There Was No Error In The Court's Standard Instruction*

*Regarding Eyewitness Identification, CALCRIM No. 315*

Defendant contends the court's instruction regarding eyewitness identification (CALCRIM No. 315) that told the jury to consider, among other things, "How certain was the witness when he or she made an identification?" deprived him of due process of law based on recent scientific research regarding the unreliability of eyewitness identification.[1] We reject defendant's argument based on California Supreme Court precedent.

---

[1]     The full version of CALCRIM No. 315 read to the jury reads as follows:

10

In *People v. Johnson* (1992) 3 Cal.4th 1183, 1231-1232, the California Supreme

Court approved the standard eyewitness identification instruction, which included a

_____

"You have heard eyewitness testimony identifying the defendant.  As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony.  In evaluating identification testimony . . . , consider the following questions:

"Did the witness know or have contact with the defendant before the event?

"How well could the witness see the perpetrator?

"What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation?

"How closely was the witness paying attention?

"Was the witness under stress when he or she made the observation?

"Did the witness give a description and how does that description compare to the defendant?

"How much time passed between the event and the time when the witness identified the defendant?

"Was the witness asked to pick the perpetrator out of the group?

"Did the witness ever fail to identify the defendant?

"Did the witness ever change his or her mind about the identification?

"How certain was the witness when he or she made an identification?

"Are the witness and defendant of different races?

"Was the witness able to identify the defendant in a photographic or physical lineup?

"Were there any other circumstances affecting the witness's ability to make an accurate identification?

"The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime.  If the People have not met this burden, you must find the defendant not guilty."

consideration of the witness's certainty of the identification. The court found no error in the instruction despite the fact that an expert defense witness had testified that a witness's confidence in an identification is not positively correlated with the accuracy of the identification. (*Id.* at p. 1231.) Four years later, in *People v. Arias* (1996) 13 Cal.4th 92, 168, the Supreme Court stated that the level of certainty displayed by the witness is among the factors to be considered in evaluating whether the eyewitness testimony should be suppressed. Finally, nine years after *Arias*, in *People v. Ward* (2005) 36 Cal.4th 186, 213, the Supreme Court held that the trial court had no sua sponte duty to modify the eyewitness identification instruction to indicate that the witness's certainty does not necessarily make the identification accurate.

We believe that this precedent from the California Supreme Court shows its approval of the standard instruction given here. Thus, we find no error, constitutional or otherwise, in this jury instruction.

DISPOSITION

The judgment is affirmed.


                                                    ROBIE            , J.


We concur:


      BLEASE         , Acting P. J.


      BUTZ            , J.

12